Filed 3/11/22  P. v. Epps CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079593 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF132260) |
| FRANCHUNE DYUEL EPPS, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of Riverside, Gail O'Rane, Judge.  Reversed; remanded with instructions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

In 2010, a Riverside jury found Franchune Dyuel Epps guilty of the first degree murders of Milton Chavez and Marvin Gabriel (Pen. Code,[1] § 187, subd. (a)). It returned true findings on multiple-murder (§ 190.2, subd. (a)(3)) and robbery-murder (*id.*, subd. (a)(17)(A)) special-circumstance allegations associated with the murder charges, and Epps was sentenced to two consecutive terms of life in prison without the possibility of parole.

In 2019, Epps filed a petition to have her murder convictions vacated and to be resentenced under section 1170.95. The trial court summarily denied the resentencing petition on grounds that Epps's record of conviction precluded her from making a prima facie case for relief. In particular, it found Epps was not entitled to resentencing, as a matter of law, due to the true multiple-murder special-circumstance findings.

Unlike the trial court, we conclude the true multiple-murder special-circumstance findings did not preclude Epps from making a prima facie case for relief. Further, the limited record of conviction before us does not disclose substantial evidence to support the true robbery-murder special-circumstance findings, which the jury rendered prior to *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Thus, the jury's true robbery-murder special-circumstance findings did not preclude Epps from making a prima facie case for resentencing either.

Because the record of conviction presently before us does not preclude resentencing as a matter of law, we reverse the order summarily denying Epps's resentencing petition, and we remand the matter for the trial court to

---

[1]     Further undesignated statutory references are to the Penal Code.

issue an order to show cause and conduct such further proceedings as are required by section 1170.95, subdivision (d).

II

BACKGROUND

A

*Factual Background*

In 2007, Epps and her codefendants Brooke Rottiers and Omar Hutchinson were charged with the first degree murders of Milton Chavez and Marvin Gabriel.  For each murder charge, there were special-circumstance allegations that each defendant was charged with multiple murders within the meaning of section 190.2, subdivision (a)(3), and that each defendant committed the murder while the defendant was engaged in, or was an accomplice in, the commission of or the attempted commission of a robbery within the meaning of section 190.2, subdivision (a)(17)(A).

The discussion below recounts the criminal prosecutions against Epps and her codefendants for the murders of Chavez and Gabriel.  It is taken from our opinion in *People v. Epps* (July 11, 2012, D059021) [nonpub. opn.].

**"A. *The People's Case***

**"1. *Discovery of the bodies***

"The victims, Gabriel and Chavez, worked in construction. Gabriel weighed between 175 and 200 pounds and was five feet eight inches tall.  Chavez weighed between 104 and 120 pounds and was five feet five inches tall.

"In the afternoon on August 29, 2006, a car was discovered next to the road in an isolated area near Lake Matthews.  When investigators from the Riverside County Sheriff's Department's Central Homicide Unit arrived at the scene, they discovered the bodies of two men, who were later identified as Gabriel and Chavez.  A washcloth was found stuffed in Gabriel's mouth, duct

3

tape covered his mouth, a belt had been wrapped around his face, and plastic bags also had been wrapped around his face and neck. A telephone cord had been wrapped around both his wrists, and a black bra had been wrapped around that telephone cord. Gabriel had been hogtied; an electrical cord was found around the wrist bindings and between the wrists and the ankles.

"Electrical cords had been wrapped around Chavez's ankles, and a leather belt had been wrapped around his chin and the back of his neck. Over that, another leather belt, a pair of panties, and two pieces of telephone cord also had been wrapped around Chavez's neck.

"Mark McCormick, M.D., a forensic pathologist for the Riverside County coroner's office, testified that Gabriel and Chavez both died from asphyxiation.

### "2. *Crime scene and investigation*

"Investigators learned from the manager of the National Inn in Corona that he had recently evicted two people, Rottiers and Hutchinson, from room 114 after the cleaning crew informed him that blankets and sheets were missing and the power cords had been removed from two motel vacuum cleaners. The manager testified that on August 28, 2006, between 8:00 and 8:30 a.m., Rottiers borrowed the motel dolly to move some items out of room 114, and a car had been backed into the garage.

"Scott Williams testified that on August 29, 2006, he was released from prison on parole and was picked up by Christy Day, the mother of his son and a recovering methamphetamine and heroin addict. Day took Williams to the National Inn where she lived. Williams indicated at trial that the National Inn was a '[k]ind of rough motel' where other parolees stayed and prostitution and drug use occurred. Williams also indicated he knew Rottiers and Hutchinson. The manager showed Williams room 114. The room had been stripped of bed linens. Two homicide detectives came to the door while Williams was in the room.

"Detective Jesse Martinez, a homicide investigator at the Riverside County Sheriff's Department, testified that on August

4

29, 2006, he was assigned to assist Senior Investigator Robert Masson (Detective Masson) and Investigator John Powers in investigating this case. Detective Martinez testified that when he, Detective Masson, and another investigator arrived at the National Inn that day, the manager told them he was in the process of renting room 114 to Williams and Day. When the investigators entered room 114, they encountered Williams.

"Day testified and identified Rottiers in the courtroom, indicating she had met Rottiers at the National Inn. Rottiers lived in room 114 in August 2006 and was in a romantic relationship with Hutchinson. Day also identified Hutchinson in the courtroom, stating she had purchased methamphetamine from him. Day denied knowing that Hutchinson was Rottiers's pimp, but, when asked about Rottiers's role as a prostitute, Day testified that Rottiers told her she would rob her customers instead of 'doing the date.'

"Day testified that on August 27, 2006, at around 10:00 p.m., she went to Rottiers's room to look for Day's daughter. When Rottiers answered the door, Day saw two Hispanic men in the room with Rottiers. One of the men was taller than Day, who is five feet seven inches tall.

"Day also testified that in the early morning hours of August 29, 2006, Rottiers came to her room, woke her up, and told her she did something she was not proud of. Rottiers said she had picked up two men in Riverside and had brought them back to her room to 'do a date,' and Hutchinson came into the room and caught her having sex with one of them. Rottiers told Day that Hutchinson said something like, 'You say you're so bad, let's see what you got' or 'Let's see what you're going to do now.' Rottiers also told Day she ended up strangling the two men with her hands, bras, and panties, and that she 'kind of liked it.' Rottiers told Day that she hit the men with her knuckles when they started to smell, and she showed Day her bruised and swollen knuckles. Rottiers also told Day she put the men's bodies in a car along with all the bedding from the room, drove out to Lake Matthews, and tried to light the car on fire, but a second car got stuck and 'they'[] had to leave before she was able to burn the car.

"According to Day, Rottiers came back to Day's room at National Inn a few days later and was talking loudly with Hutchinson on a Nextel phone. Day overheard Rottiers say something about DNA, that Hutchinson was being 'weak,' and that she would do the same thing to him as she did to 'those two mother fuckers' she had killed. At that point, the manager came to the room and told Rottiers to leave.

"Richard Stornetta testified that he and Williams were released from prison at the same time, and Day picked them up and took them to the National Inn. Stornetta went with Williams to look at room 114, which Stornetta described as torn up and 'stripped.' A woman nicknamed 'Crazy,' whom Williams identified at trial as Rottiers, came to Day's room. Stornetta heard Rottiers talking on the phone with someone, yelling at that person and calling that person a 'weak piece of shit' who could not even help her 'pick up one of 'em.' Rottiers talked about her DNA being all over the room and said something about a dolly cart. At that point Williams asked Rottiers to leave.

"Yvette Meek, a recovering drug addict, testified she knew Rottiers and Hutchinson in 2006. Meek stated that Rottiers told her she would pick up guys pretending to be a prostitute, and then she would rob them without going through with the sexual act.

   "3. *Forensic evidence*

"Megan Mannion–Gray, a criminalist at the California Department of Justice's Jan Banshinski [sic] Laboratory and Bureau of Forensic Services, testified about DNA testing on evidence taken from the victims. Epps, who is an African–American, was excluded as a DNA donor on 15 items compared by the lab. Regarding a swab taken from one item of evidence as to which Epps could not be excluded as a DNA donor, there was a 33 percent chance that a randomly selected African–American could have been the donor. Regarding another swab as to which Epps could not be excluded as a DNA donor, there was more than a 50 percent chance that a randomly selected African–American could have been the donor. Rottiers could not be excluded as a contributor of DNA discovered on an electrical cord, but Epps could be excluded. Rottiers could not be excluded as a contributor

6

of DNA found in fingernail clippings taken from Gabriel, but Epps could be excluded. Rottiers also could not be excluded as a contributor of DNA discovered on a belt, but Epps could be excluded.

### "4. *Phone records*

"A radio frequency engineer working for Ericsson under contract for Sprint Nextel, provided expert testimony regarding phone records obtained from Sprint in this case. He indicated that the timing, duration, and locations of cell phone calls can be determined from phone records and cell tower locations.

"Authenticated Sprint Nextel cell phone records for Epps, Rottiers, and Hutchinson were presented to the jury. The phone records showed direct connect communications made on August 27, 2006, from Epps's phone to one belonging to Rottiers that carried the billing of 'Krazie Hutchinson.' A total of four such phone connections were recorded between 9:46 p.m. and 10:18 p.m. on August 27. A fifth connection between those two phones was recorded early the next morning, August 28, at 2:22 a.m.

"The phone records also showed a direct connect communication made from Rottiers' phone to Epps's phone at 10:15 p.m. on August 27, 2006. Later that night, at 11:23 p.m., a direct connect communication was made between Epps's phone and Hutchinson's phone. The next day, August 28 at 12:15 p.m., a connection was also made from Epps's phone to Hutchinson's phone.

### "5. *Epps's May 15, 2007 statements to Detectives Masson and Martinez*

"On May 15, 2007, Epps gave a statement to Detectives Masson and Martinez, a transcript of which was admitted into evidence. Epps indicated she knew Rottiers through a mutual boyfriend, Brandon Evans, who had been Epps's boyfriend two or three years earlier. Epps knew that Rottiers's nickname was 'Crazy' and Rottiers's current boyfriend, Hutchinson, was Rottiers's pimp. She claimed she went to the National Inn in Corona at around 2:00 a.m. to buy drugs from Hutchinson, and she was high on drugs at the time. She stated that when she arrived at

7

the motel room, she saw Rottiers, Hutchinson, and Rottiers's twin daughters. She described the room as 'junky,' with phone cords ripped from the wall, vacuum cleaners with cords ripped out, and a phone on the bed with no cord.

"Epps stated that Rottiers and Hutchinson were arguing when she entered the room. Rottiers told Hutchinson he was stupid and careless, and Hutchinson called Rottiers a 'stupid bitch.' Epps told the detectives Hutchinson said, 'Oh, shit, the blanket,' and Rottiers threw a blanket on the floor as if she were hiding something. Epps said she did not know what was under the blanket, but it was something 'kind of lumpy,' and an investigator later told her the 'lumps' were bodies.

"Epps asked, 'Am I being recorded?' When Detective Masson assured her that she was not being recorded, but that Detective Martinez was taking notes for a report, Epps provided additional details about the homicides. She stated that she saw Rottiers and Hutchinson wrapping up the bodies in blankets, and she helped them move one [of] the bodies to the trunk of the car Rottiers was driving. Epps said that to get the body into the trunk, she lifted one side of the blanket and Rottiers lifted the other. Rottiers and Hutchinson moved the second body to the trunk of the car after Rottiers asked the motel manager for a dolly. Hutchinson left after the second body was put in the car. Epps stated she helped Rottiers vacate the motel room and move to the Flaming Arrow motel.

"Epps told the detectives she left Rottiers at the Flaming Arrow, but later saw her driving around town as Epps was driving down the street with the bodies in the trunk. Rottiers told her she needed to drop the car off, and Epps led her to the Lake Matthews area where she showed Rottiers an open space where she could leave the car. Rottiers pulled off the road, left the engine running as if the car had been abandoned, and then hopped out of the car and let it roll. Epps said she got out of her car and cursed at Rottiers for leaving the engine running, and then they got into Epps's car. Epps started driving Rottiers back to her motel room. However, following Rottiers's directions, Epps drove the car into sand and she had to call for a tow truck to pull it out. Epps left Rottiers by the side of the road and drove home.

"When pressed, Epps told the detectives that Rottiers killed the two men by smothering them by stepping on their faces with her bare feet after they were tied up. Epps stated she was sitting in the room when it happened, and Rottiers killed the larger man first. She claimed she did not know how the other man died; she looked over and he was not moving or breathing. Epps then said Rottiers smothered the smaller man first. She claimed she went there because Rottiers 'chirped' her that Hutchinson had 'chronic' (drugs) for her.

"Contrary to her earlier version of the facts, Epps then told the detectives that the two men were still dressed when she arrived at the motel room, and both undressed when Rottiers told them to do so. The men thought they were about to have sex. Rottiers began hitting them with Hutchinson's belt. Rottiers punched the smaller man and knocked him out. The larger man was covering his private parts with his hands when Hutchinson hit him and knocked him to the floor. Rottiers then tied up both men using cords from the phone and vacuum cleaners. Rottiers then killed both men, the smaller man first, with Rottiers's daughters still in the room. Epps again stated that Rottiers killed the larger man by stepping on his face and smothering him, but also stated she did not know how the smaller man died.

"Epps told the detectives she pulled her car into the motel just as Rottiers and the two men were getting out of their car. Rottiers and the two men entered the motel room about 30 seconds before Epps entered the room. Hutchinson was already in the room with Rottiers's daughters.

"Epps stated she 'might have handed [Rottiers] the phone cord.' She said she knew the cord was not hooked up to the wall phone because the cord was by her leg and she grabbed it. Epps said she 'probably tried to give [the cord] to her and it didn't go, so she snatched [it].' Epps admitted she pulled the cord from the wall. She then said Rottiers 'ripped it out of the wall.' She said she watched Rottiers rip the cord out of the vacuum cleaner. Epps denied handing Rottiers any duct tape.

9

**"6. *Epps's June 14, 2007 statements to the district attorney***

"On June 14, 2007, Epps was interviewed by District Attorney Senior Investigator Tom Dove and Deputy District Attorney John Molloy. A transcript of the interview was admitted into evidence.

"Epps stated she met Hutchinson a month or two before August 2006. She bought drugs from him. Epps had known Rottiers since about 2003. She met Rottiers through Epps's former boyfriend, Evans.

"According to Epps, she went to the National Inn on the day of the incident to buy drugs from Hutchinson. When she arrived, six people were in the room: Rottiers, Rottiers's two daughters, who were asleep on the bed, Hutchinson, and 'two Mexican guys,' who were lying naked on the floor. Epps stated that Rottiers and Hutchinson were arguing about something, and she (Epps) was 'so high' on drugs at the time she could not remember what they were arguing about and she could not remember whether the two men were tied up. She recalled that Rottiers, who was barefooted, walked over to the smaller man, who was praying, and stepped on his nose and mouth. Hutchinson was standing over the man, who started kicking, and told him not to move. The man's face turned purple and he urinated on himself. The larger man, who was crying, stood up.

"Epps stated that one of Rottiers's girls woke up and Hutchinson was going to take her out, but Rottiers told him not to leave and, pointing to the larger man, said, 'This one has to go, too.' Rottiers started punching and spitting on the larger man, who fell to his knees and begged her to stop, saying 'please, please.' Rottiers hit him again and then Hutchinson punched him. When Hutchinson hit him, the man fell and hit his head on the edge of the door. Rottiers then stepped on his nose and mouth with both feet and leaned against the wall to keep her balance. The man was kicking and Rottiers stood on his face for 10 to 15 minutes. Epps claimed she sat on the bed during the entire incident. According to Epps, when Rottiers finished she asked Epps to help her move her things to another motel. Epps helped put her things into the victims' car and took them to the

10

other motel while Hutchinson took the girls to a fast-food restaurant.

"Epps admitted she helped Rottiers put the smaller man into the car. They carried him on a blanket. Epps said she grabbed one end of the blanket, Rottiers grabbed the other end, and they walked up to the car and put him in the trunk. When Rottiers and Hutchinson were unable to lift the heavier man's body, which was wrapped in a blanket, Rottiers asked the manager for a dolly and brought it back to the room. Epps said she was holding the girls as Rottiers and Hutchinson put the 'big guy' on the dolly, pulled him out to the car, and put him in the trunk on top of the 'little guy.' Epps also admitted she drove her borrowed car and led Rottiers to a place near Lake Matthews in the mountains to dispose of the victims' car and the bodies. On the way back, Epps's car got stuck in sand and she called for a tow truck. To help pay for the tow service, Rottiers got into 'some other dude's' car and was paid $150 to do a 'quickie.' Rottiers used Epps's cell phone to call for a cab and left on her own, but Epps said she did not know how she returned to Corona.

"When questioned about DNA evidence, Epps admitted she might have touched a vacuum cleaner or a vacuum cleaner cord or a telephone cord. She stated it was possible the two men were tied up when she arrived at the motel.

"Epps denied that she participated in killing the victims. She denied seeing duct tape on the face of one of the men. Epps claimed she did not see Rottiers kill the man who was lying unconscious on the floor when Epps arrived; she only watched Rottiers kill the 'big guy.' However, she then stated she saw Rottiers stand on both men. Epps denied the men were hogtied.

"Epps claimed a phone cord was on her foot, she grabbed it, and then she dropped it without giving it to Rottiers. She claimed that when she grabbed for the phone cord, Rottiers told Epps to give her the vacuum cleaner cord, Epps said, 'I ain't giving you shit,' and Rottiers then ripped the cord out of a vacuum cleaner. Epps admitted she watched as Rottiers tied up one of the men with a cord she ripped out of a vacuum cleaner.

11

"The People rested on June 9, 2010, in the presence of all three juries.

**"B. *The Defense Cases***

**"1. *Epps's and Rottiers's defense***

"On June 9, 2010, after the People rested, Rottiers and Epps presented no witnesses and rested in the presence of all three juries based upon 'the sufficiency of the prosecution case.'

**"2. *Hutchinson's defense***

"The next day, June 10, Hutchinson's counsel informed the court and counsel for the other parties that Hutchinson had decided to testify on his own behalf.

"In the presence of all three juries, Markson first presented the testimony of Virgal Cooper, who stated that he used methamphetamine in the summer of 2006, he lived at the National Inn motel in Corona at that time, and Hutchinson was his methamphetamine supplier. Cooper indicated that in late August 2006, he used his cell phone to call Hutchinson to buy some methamphetamine. Although Cooper initially stated he called Hutchinson after midnight, he then acknowledged his cell phone records showed he made the call at 10:26 p.m. Cooper met with Hutchinson at the bottom of the stairs outside Cooper's motel room about 20 or 30 minutes later and bought some methamphetamine from Hutchinson. As they were sitting on the stairs, Cooper saw a small car pull into the motel parking lot. According to Cooper, four people were in the car: Rottiers, two 'Hispanic guys,' and an African–American woman. When asked by Hutchinson's counsel whether he saw any of those four people in the courtroom, Cooper testified he saw one: Rottiers.

"On cross-examination by Epps's counsel, Cooper stated he did not know Epps, but he had met her twice through 'other people.' When counsel said, 'You told Officer Gibson, "I never met Franchune Epps at all and cannot recall ever having met her," ' Cooper responded he had '[n]ever met her formally.' Counsel then asked Cooper, 'You don't recognize her in the courtroom today?' Cooper replied, 'No, I don't.' He then testified he met Epps at a motel '[d]own the street—I forget the name of it—by

12

the pool hall.'  When asked, Cooper could not remember the name of the pool hall, but indicated it was next door to a CVS pharmacy.

### "a. *Hutchinson's testimony before all three juries*

"Also on June 10, 2010, following Cooper's testimony, Hutchinson testified on his own behalf in the presence of all three juries.  He indicated that he and Rottiers started living together in June or July of 2006.  He noticed that she put the name 'Krazie Hutchinson' on one of the phone bills that was in her name.  On August 11, 2006, he moved his belongings into room 114 at the National Inn, but did not always stay there.

"Hutchinson stated that on Sunday morning, August 27, he woke up at the Motel 6 and went over to the National Inn to check on Rottiers's twin daughters.  When he arrived, he found Rottiers vacuuming the room.  He and Rottiers got into an intense argument.  Rottiers tried to bully him, and he told her he was no longer going to pay for the room and she needed to find somewhere to go.  After 20 minutes, he left.  He testified he had no plans to get back with Rottiers that evening or to watch her daughters or to commit a robbery that night.

"Hutchinson stated he next saw Rottiers at around 2:30 the next morning (August 28).  He was sitting on a chair behind a wall in the carport and putting some 'dope' in a sack for Cooper, who had called him at 10:30 p.m., when two cars came in and parked in the carport.  Rottiers was driving one of the cars and Chavez and Gabriel were with her.  Hutchinson identified Epps in the courtroom as the driver of the other car.  He testified that Epps was carrying a stick in her hand that looked like half of a mop handle.

"Hutchinson indicated that he confronted Rottiers about the two men as they were walking towards room 114, and she told him she was about to rob the men and asked whether he wanted to help.  Hutchinson said he told Rottiers he had $900 in his pocket and did not need to rob anyone.  Rottiers went to the room and he went back to talk to Cooper.  Shortly thereafter, out of curiosity, Hutchinson went to the room.  He stated he knocked on the door, and, when Rottiers opened it, he saw the two men were dressed

13

and money and wallets were on the bed.  He saw Epps sitting in a chair by the kitchen playing with a cell phone.  Rottiers, who had been speaking to the two men in Spanish, told Hutchinson that one of them said he was going to do something to her girls.  Hutchinson testified he immediately jumped on the 'big guy' (Gabriel) and they both fell on the bed.

"Hutchinson testified his statement to Detective Masson that he hit the man after the man lunged at Rottiers was a 'pure ass lie.'  Hutchinson also testified that his statement to Detective Masson that Epps had a gun was false, and he made that false statement because Rottiers asked him to do so.

"According to Hutchinson, he sat down on the bed and read a magazine after he hit Gabriel.  He said that Rottiers and Epps left the room to check the car, and he stayed in the room.  The door was open and the men did not leave.  Rottiers and Epps quickly returned.  Hutchinson testified that Rottiers looked at him and Epps with a 'mean' look, and then hit the 'big dude,' Gabriel, on the back of his head with the telephone that was in the room.  According to Hutchinson, Epps then hit the other man (Chavez) with the stick she was carrying, and Hutchinson left the room after telling Rottiers and Epps they were crazy.

"Hutchinson testified he returned to room 114 later that morning at around 4:00 a.m.  He indicated he did not expect Gabriel and Chavez to be there because 'pretty much the robbery's done.'  He saw that Chavez was naked and hogtied with his hands behind his back and his wrists tied to his ankles.  He had a belt around his neck.  Hutchinson acknowledged that, at Rottiers's request, he told Detective Masson that Rottiers had told him that '[Epps] made me do it,' but he testified that statement was not true.  Hutchinson stated that Rottiers 'had asked me to blame [Epps] for that.'

"According to Hutchinson, Chavez started choking when Rottiers tried to loosen the belt around his neck.  Hutchinson said he saw Gabriel lying naked and unresponsive on the floor, moaning and groaning.  Rottiers started asking for cords to tie up the men, and Hutchinson suggested she use a vacuum cleaner cord.  Hutchinson tugged weakly on the cord, and Rottiers snatched it and ripped it out of the vacuum cleaner.  He stated that Epps

14

threw a phone cord near Rottiers, and he was in the room for only about 10 to 15 minutes and then left.

"Hutchinson said he returned to the National Inn and walked back to room 114 a third time at around 6:00 a.m. after Rottiers called him. As he was walking back to the room, he saw the manager standing by the office. As he approached the room, he saw Rottiers coming out of the room and rolling one of the bodies out on a dolly. When Rottiers rolled the dolly up to the trunk of the car, she asked Hutchinson, who was standing next to the trunk, to help her hoist the body into the trunk. Chavez's body was already in the trunk, and Epps was also standing by the car. He did not hear Chavez making any noises and he did not see any movement in the blanket covering his body.

"Hutchinson claimed he did not help Rottiers put Gabriel's body in the trunk, but admitted that when Rottiers asked him where she should dump the bodies, he told her to dump them in a field in the Lake Matthews area. He stated that he and Rottiers later went to Orange County and Rottiers complained he did not help her dispose of the bodies.

"On June 15, after he completed his testimony, Hutchinson rested.

### "[3]. *Epps's and Rottiers's defense cases*

"Also on June 15, after Hutchinson completed his testimony and rested, Rottiers and Epps rested without presenting any witnesses."

(*People v. Epps, supra*, D059021.)

The trial court instructed Epps's jury on two alternative theories of murder liability—willful, deliberate, and premeditated murder, and felony murder. After deliberations, the jury convicted Epps of both counts of first degree murder. (*People v. Epps, supra*, D059021.) It also returned true findings on the multiple-murder and the robbery-murder special-circumstance allegations associated with each count. (*Ibid.*)

15

The court sentenced Epps to two consecutive terms of life in prison without the possibility of parole. (*Ibid.*)

On direct appeal, our court affirmed Epps's judgment of conviction. (*People v. Epps, supra*, D059021.) In doing so, we rejected an argument that the trial court erroneously denied a motion for acquittal Epps had filed pursuant to section 1118.1. (*Ibid.*) We concluded the trial court properly denied the motion for acquittal because the prosecution had elicited substantial evidence from which a rational jury could conclude, beyond a reasonable doubt, "that Epps aided and abetted the commission of the crimes with knowledge of Rottiers's unlawful purpose and with the intent to facilitate or encourage Rottiers's perpetration of the crimes." (*Ibid.*)

Further, our court rejected Epps's argument that the trial court violated her Sixth Amendment right to effective assistance of counsel, as well as her Fifth and Fourteenth Amendment rights to a fair trial, by permitting Hutchinson to testify in front of her jury after she rested her case, and not affording her counsel additional time to prepare his cross-examination of Hutchinson. (*People v. Epps, supra*, D059021.) We assumed the court committed constitutional error as alleged, but concluded the error was harmless beyond a reasonable doubt. (*Ibid.*)

On October 24, 2012, the Supreme Court denied review.

## B

### *Senate Bill No. 1437*

In 2018, the Governor signed Senate Bill No. 1437 (2017–2018 Reg. Sess.) into law, effective January 1, 2019. The expressed purpose of the law was "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability

16

is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill No. 1437 effectuated this legislative goal by amending section 188, which defines malice, and section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, § 3.)

As amended, section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Amended section 189, subdivision (e) states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] [or] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Senate Bill No. 1437 also enacted section 1170.95, "which creates a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) The Legislature subsequently amended section 1170.95 to "[c]larif[y] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable

17

consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1(a).)

Section 1170.95, subdivision (a) provides: "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder. [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

Under section 1170.95, subdivision (b)(1), a resentencing petition must include "(A) A declaration by the petitioner that the petitioner is eligible for relief … based on all the requirements of [section 1170.95,] subdivision (a). [¶] (B) The superior court case number and year of the petitioner's conviction. [¶] (C) Whether the petitioner requests the appointment of counsel." (§ 1170.95, subd. (b)(1).) "If a petition fails to comply with subdivision (b)(1),

18

'the court may deny the petition without prejudice to the filing of another petition.' (§ 1170.95, subd. (b)(2).)" (*Lewis, supra*, 11 Cal.5th at p. 960.)

"Where the petition complies with subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. (§ 1170.95, subd. (c).)" (*Lewis, supra*, 11 Cal.5th at p. 960.) When deciding whether a petitioner has made a prima facie showing for relief, the court may reference the petitioner's record of conviction. (*Id.* at pp. 970–971.) " '[I]f the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Id.* at p. 971.) Generally, an appellate opinion is "considered to be part of the record of conviction." (*Id.* at p. 972.) The court may also "rely on the jury instructions, which are part of the record of conviction, in assessing the prima facie showings under section 1170.95(c)." (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055.)

If a prima facie showing has been made, the court must issue an order to show cause and hold an evidentiary hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) At the hearing, the burden is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).) The court "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness

19

testimony, stipulated evidence, and matters judicially noticed," as well as "the procedural history of the case recited in any prior appellate opinion." (*Ibid.*)  Additionally, the parties may "offer new or additional evidence to meet their respective burdens."  (*Ibid.*)

## C

### *Epps's Resentencing Petition*

In 2019, Epps filed a petition to have her murder convictions vacated and to be resentenced under section 1170.95.  On her petition, she placed checkmarks next to the following preprinted statements:  "1. A complaint, information, or indictment was filed against [Epps] that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] 2a. At trial, [Epps] was convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine … [¶] 3. [Epps] could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code § § [sic] 188 and 189, effective January 1, 2019."  She also requested counsel for the resentencing proceeding.

The People filed an opposition to the resentencing petition.  They argued the court should deny the resentencing petition, without issuing an order to show cause, for multiple reasons.  Of relevance here, they argued Epps could still be convicted of first or second degree murder under amended sections 188 and 189, and could not make a prima facie case for relief, because she was a major participant in the robbery and she acted with reckless indifference to human life.  In support of this claim, the People relied on the jury's true robbery-murder special-circumstance findings and our opinion affirming Epps's judgment of conviction.

20

The trial court appointed counsel for Epps. With the assistance of counsel, Epps filed a reply brief in support of her resentencing petition.

After several continuances, the People filed a supplemental request for summary dismissal of the resentencing petition. They again argued Epps could not make a prima facie case for relief because she could still be convicted of murder under amended sections 188 and 189. The People reiterated their assertion that the true robbery-murder special-circumstance findings meant the jury necessarily found, at minimum, that Epps was a major participant in the robbery and she acted with reckless indifference to human life. Alternatively, they argued the jury's true multiple-murder special-circumstance findings meant the jury necessarily found that Epps harbored an intent to kill.[2] The People contended both of these findings precluded resentencing as a matter of law.

The trial court held a hearing and summarily dismissed Epps's resentencing petition without issuing an order to show cause. It determined Epps was "ineligible for relief because her conviction[s] would be unaffected by the changes to sections 188 and 189." The court based this conclusion on the jury's true multiple-murder special-circumstance findings. According to the court, the true multiple-murder special-circumstance findings meant the jury necessarily "found [Epps] was an aider and abettor who acted with the intent to kill and harbored express malice, and there [was] no possibility that the jury's verdict[s] rested on a now-invalid theory of murder."

---

[2]    In their supplemental request for summary dismissal, the People requested judicial notice of certain jury instructions given during Epps's criminal trial, among other documents. It is not apparent from the record whether the court granted the request.

21

III

DISCUSSION

A

*Legal Standards*

"Because we are tasked with applying the section 1170.95, subdivision (c) standard governing prima facie entitlement to relief [citation], our review is de novo. [Citation.] As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the lawmakers' intent. [Citation.] [¶] In applying the de novo standard, we accept the pleaded facts as true [citation], but evaluate those facts in light of facts readily ascertainable from the record of conviction." (*People v. Secrease* (2021) 63 Cal.App.5th 231, 244 (*Secrease*), review granted June 30, 2021, S268862.)

B

*Multiple-Murder Special-Circumstance Findings*

The trial court found the jury's true multiple-murder special-circumstance findings, standing alone, precluded resentencing as a matter of law. According to the court, these true findings precluded relief because they meant the jury necessarily found that Epps aided and abetted the victims' actual killer and harbored an intent to kill.

On appeal, the People do not defend the trial court's analysis. Indeed, they hardly even mention the jury's true multiple-murder special-circumstance findings, or the trial court's ruling. Epps devotes only marginally more attention to these issues, arguing—without citation or substantive analysis—that an order to show cause should issue because the jury did not "necessarily [find] that she had an intent to kill."

At minimum, we would expect the parties to identify the basis for the trial court's ruling in their appellate briefs and state, with citations and authorities, whether the court's ruling was correct or incorrect. Thus, the parties' failure to meaningfully address the effect, if any, of the true multiple-murder special-circumstance findings is both perplexing and disconcerting. Nonetheless, given the importance of the issue to the outcome of this appeal, we have conducted an independent analysis of the matter. Our analysis leads us to conclude that the true multiple-murder special-circumstance findings did not automatically preclude relief, as the trial court believed.

"To find true the multiple-murder special-circumstance allegation, a jury must find that the defendant has been convicted of at least two counts of murder, at least one of which must be first degree murder, and that the defendant either actually killed or intended to kill at least one of the victims." (*People v. Mora & Rangel* (2018) 5 Cal.5th 442, 495.) However, our courts "have never held that the multiple-murder special circumstance requires a jury to find the defendant intended to kill *every victim*." (*People v. Dennis* (1998) 17 Cal.4th 468, 516, italics added; *People v. Holmes, McClain, & Newborn* (2022) 12 Cal.5th 719, 785 ["The multiple-murder special circumstance does not require a finding of intent to kill more than one victim."]; *People v. Rogers* (2006) 39 Cal.4th 826, 892 ["Our state law never has required a jury to find intent to kill both victims in order for the multiple-murder special circumstance to be found true."]; see *People v. Maciel* (2013) 57 Cal.4th 482, 521 ["Because the evidence of defendant's intent to kill [one victim] is sufficient to uphold the multiple-murder special circumstance, we need not decide whether there was sufficient evidence that defendant intended to kill the other victims."].)

Here, it is undisputed that Epps was not the actual killer of either victim. Thus, the true multiple-murder special-circumstance findings mean the jury found that Epps intended to kill at least one of the two victims. However, they do not conclusively establish that she intended to kill both victims. Given that the prosecution instructed the jury on felony murder, in addition to willful, deliberate, and premeditated murder, it is possible the jury found Epps guilty of one murder charge under the theory that she was a direct aider and abettor who harbored an intent to kill, whereas it found her guilty of the second murder charge under a felony-murder theory of liability.

The limited record before us does not include the jury verdicts or any other component of the record of conviction disclosing the theory of liability relied upon by the jury for each murder charge. Nor does it disclose whether the jury found that Epps intended to kill both victims, or just one victim—and if so, which victim. Because the limited record before us does not disclose such information, we cannot conclude that the true multiple-murder findings, standing alone, precluded Epps from making a prima facie case for relief as a matter of law.

C

*Robbery-Murder Special-Circumstance Findings*

The parties devote substantially more attention in their appellate briefs to an issue not addressed by the trial court—that is, whether the jury's true robbery-murder special-circumstance findings precluded Epps from making a prima facie case for relief as a matter of law.

The People urge us to affirm the summary dismissal order based on the true robbery-murder special-circumstance findings. To reach a true felony-murder special-circumstance finding, a jury must find the defendant was the actual killer, aided and abetted in the commission of the murder with an

24

intent to kill, or aided and abetted in the commission of the felony while acting as a major participant and with reckless indifference to human life. (§ 190, subds. (b)–(d).) Because these requirements are identical to the felony-murder requirements under amended section 189, subdivision (e), the People claim Epps cannot prove one of the elements necessary to obtain resentencing—to wit, that she "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3).)

Epps argues the robbery-murder special-circumstance findings did not categorically bar her from making a prima facie case for relief under section 1170.95. She notes the jury returned its true robbery-murder special-circumstance findings before the Supreme Court issued its seminal decisions in *Banks, supra*, 61 Cal.4th 788, and *Clark, supra*, 63 Cal.4th 522. In those cases, the Supreme Court "clarified the meaning" of the special-circumstance statute (§ 190.2). (*In re Scoggins* (2020) 9 Cal.5th 667, 671.)

As we will explain, we agree with Epps that a pre-*Banks* and *Clark* felony-murder special-circumstance finding, standing alone, does not necessarily preclude a defendant from obtaining resentencing under section 1170.95. Further, on the limited record of conviction presently before us, we cannot conclude that sufficient evidence supported the jury's robbery-murder special-circumstance findings under the standards enunciated in *Banks* and *Clark*. In the absence of such evidence, the jury's pre-*Banks* and *Clark* robbery-murder special-circumstance findings did not preclude Epps from making a prima facie case for relief. Therefore, the trial court's summary denial order must be reversed and the matter remanded so that the trial court may issue an order to show cause and hold an evidentiary hearing.

## 1

### *The* Banks *and* Clark *Decisions*

The special-circumstance statute (§ 190.2) sets forth the circumstances under which killers and certain aiders and abettors of first degree murder may be eligible for the death penalty or life in prison without the possibility of parole.  (*Banks, supra*, 61 Cal.4th at p. 797.)  "In the case of first degree felony murder, 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant' aids or abets the crime may be convicted of special-circumstance murder."  (*Id.* at p. 798, quoting § 190.2, subd. (d).)  Thus, when first degree felony murder is at issue, the special-circumstance statute "imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life."  (*Banks*, at p. 798.)

*Banks* articulated various factors relevant to assessing the actus reus (major participant) requirement.  To determine whether a defendant was a major participant in a crime, a court must examine:  what role the defendant had in planning the criminal enterprise that led to one or more deaths; what role the defendant had in supplying or using lethal weapons; what awareness the defendant had of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; and whether the defendant was present at the scene of the killing, in a position to facilitate or prevent the actual murder, or played a particular role in the death.  (*Banks, supra*, 61 Cal.4th at p. 803.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' "  (*Ibid.*)

26

*Clark* addressed the mens rea requirement of the special-circumstance statute. The mens rea requirement has "subjective and objective elements." (*Clark, supra*, 63 Cal.4th at p. 617.) "The subjective element is the defendant's conscious disregard of risks known to him or her," while the objective element considers "what 'a law-abiding person would observe in the actor's situation.'" (*Ibid.*) *Clark* identified the following factors, many of which overlap with the *Banks* factors, as pertinent to whether a defendant acted with reckless indifference to human life: the defendant's knowledge that weapons would be used and/or his personal use of weapons; the defendant's physical presence at the scene and his opportunity to restrain the killer or aid the victim; the duration of the felony; the defendant's knowledge of his accomplice's propensity to kill; and the defendant's efforts to minimize the risk of violence in the commission of the felony. (*Clark,* at pp. 618–623.)

2

*Pre-*Banks *and* Clark *Felony-Murder Special-Circumstance Findings Do Not Categorically Preclude Resentencing as a Matter of Law*

"In the years immediately following the decisions in *Banks* and *Clark,* courts applied the standards enunciated in those cases in the setting of habeas corpus [citation], and in section 1170.95 resentencing proceedings that had been preceded by a successful collateral attack on a felony-murder special-circumstance finding based on *Banks* and *Clark* [citation]." (*Secrease, supra*, 63 Cal.App.5th at p. 252, review granted.) Since then, the *Banks* and *Clark* standards have been considered in another context—in section 1170.95 resentencing proceedings that were *not* preceded by a successful collateral attack on a felony-murder special-circumstance finding. Within this context, the Courts of Appeal are divided on whether a pre-*Banks* and *Clark* felony-murder special-circumstance finding categorically bars a defendant from making a prima facie showing that he or she is entitled to resentencing.

27

"[S]ome courts now hold a section 1170.95 petitioner must always mount a successful collateral attack on a prior felony-murder special-circumstance finding against him—no matter when it was made—and until he does so, he cannot plead a prima facie case under section 1170.95, subdivision (c) as a matter of law."[3] (*Secrease, supra*, 63 Cal.App.5th at p. 252, review granted.) "The courts so holding point out that major participation and reckless disregard of human life have always been required elements of a special circumstance finding under section 190.2, subdivisions (a)(17) and (d). And because revisiting those issues in a section 1170.95 proceeding, ' "in effect," ' amounts to an attack on a valid special circumstance finding, these courts take the view that a defendant in [Epps's] position must first invalidate the special circumstance finding before he [or she] may seek section 1170.95 relief. [Citations.] In this view, it is not the changes to sections 188 and 189 that potentially render such a defendant's murder conviction invalid under current law; it is the *Banks* and *Clark* decisions that have that effect, which is why the remedy of habeas corpus must be sought in the first instance." (*Secrease*, at pp. 252–253.)

"Other courts do not impose a requirement that a section 1170.95 petitioner who seeks resentencing in the face of a prior jury finding under

---

[3] See *People v. Gomez* (2020) 52 Cal.App.5th 1, 14–17, review granted October 14, 2020, S264033 (*Gomez*); *People v. Galvan* (2020) 52 Cal.App.5th 1134, 1142, review granted October 14, 2020, S264284; *People v. Jones* (2020) 56 Cal.App.5th 474, 483–484, review granted January 27, 2021, S265854; *People v. Allison* (2020) 55 Cal.App.5th 449, 457; *People v. Murillo* (2020) 54 Cal.App.5th 160, 168, review granted November 18, 2020, S264978; *People v. Nunez* (2020) 57 Cal.App.5th 78, 95–96, review granted January 13, 2021, S265918; cf. *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419–420 [rejecting claimed entitlement to § 1170.95 relief raised in appeal of murder conviction on the ground jury's special-circumstance finding rendered appellant ineligible for resentencing as a matter of law].)

section 190.2, subdivision (a)(17) must first obtain habeas relief, and hold that he [or she] may opt to pursue relief by attacking his murder conviction—not his [or her] special circumstance finding—on the ground that, under current law as revised by Senate Bill [No.] 1437, he [or she] could no longer be convicted of murder."[4]  (*Secrease, supra*, 63 Cal.App.5th at p. 253, review granted.)  "According to these courts, if the petitioner obtains vacatur of a prior special circumstance finding in a section 1170.95 proceeding, that is because the statute expressly requires it as a 'collateral consequence' of the resentencing relief to which a successful section 1170.95 petitioner is entitled. [Citation.] [¶] These courts see no basis to graft what is, in effect, an exhaustion requirement onto section 1170.95, thereby forcing petitioners with felony-murder special-circumstances findings to obtain habeas relief first, before seeking section 1170.95 resentencing.  In their view, because *Banks* and *Clark* 'construed section 190.2, subdivision (d) in a significantly different, and narrower manner than courts had previously construed the statute' [citation], it is not appropriate to give a pre-*Banks* and *Clark* felony-murder special-circumstance finding preclusive effect.  As [one] panel … explained, '[i]t would be inappropriate to "treat[ ] [such] findings as if they

---

4      See *People v. Torres* (2020) 46 Cal.App.5th 1168, 1179–1180, abrogated on another ground in *Lewis, supra*, 11 Cal.5th at pp. 961–970; *People v. Smith* (2020) 49 Cal.App.5th 85, 93–94, review granted July 22, 2020, S262835; *People v. York* (2020) 54 Cal.App.5th 250, 259–261, review granted November 18, 2020, S264954; *People v. Harris* (2021) 60 Cal.App.5th 939, 956–958, review granted April 28, 2021, S267802 (*Harris*); *Secrease, supra*, 63 Cal.App.5th at pp. 244–245, review granted; *People v. Gonzalez* (2021) 65 Cal.App.5th 420, 430–431, review granted August 18, 2021, S269792; *People v. Arias* (2021) 66 Cal.App.5th 987, 1003–1004, review granted September 29, 2021, S270555 (*Arias*); *People v. Wilson* (2021) 69 Cal.App.5th 665, 673, review granted December 22, 2021, S271604 (*Wilson*); *People v. Ervin* (2021) 72 Cal.App.5th 90, 111, fn. 6; *People v. Mejorado* (2022) 73 Cal.App.5th 562, 565 (*Mejorado*).)

29

resolved key disputed facts" when the jury did not have the same questions before them.' " (*Secrease*, at pp. 253–254.)

The Courts of Appeal have subjected the issue at hand to vigorous debate and devoted countless pages of discussion to the subject. The issue is currently under review by the Supreme Court as well, so we will soon have clarity one way or the other. (*People v. Strong*, review granted Mar. 10, 2021, S266606 ["This case presents the following issue: Does a felony-murder special circumstance finding (Pen. Code, § 190.2, subd. (a)(17)) made before *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 preclude a defendant from making a prima facie showing of eligibility for relief under Penal Code section 1170.95?"].) Given this context, we need not add to the conversation with further extensive argument or analysis.

Rather, it will suffice for us to follow the path our court has already charted in *Arias, supra*, 66 Cal.App.5th 987, review granted December 22, 2021, S271604, and *Wilson, supra*, 69 Cal.App.5th 665, review granted. In those decisions, we concluded pre-*Banks* and *Clark* true felony-murder special-circumstance findings do not categorically preclude defendants from obtaining resentencing relief under section 1170.95 as a matter of law. (*Arias,* at pp. 1003–1004; *Wilson*, at p. 673; but see *Gomez, supra*, 52 Cal.App.5th at p. 17, review granted.) In accordance with these precedents, we conclude the true robbery-murder special-circumstance findings did not categorically preclude Epps from making a prima facie case for relief.

3

*The Available Record of Conviction Does Not Disclose Substantial Evidence to Support the True Robbery-Murder Special-Circumstance Findings*

Although a pre-*Banks* and *Clark* robbery-murder special-circumstance finding does not automatically preclude resentencing, that fact alone does not require us to reverse and remand the matter for issuance of an order to show

cause. Rather, "[t]he most natural reading of section 1170.95 … is that where a petitioner facing a felony-murder special-circumstance finding has never been afforded a *Banks* and *Clark* sufficiency-of-the-evidence review— by any court, at the trial or appellate level—section 1170.95 courts have an obligation to undertake such an analysis at the prima facie entitlement-to-relief stage of a resentencing proceeding under subdivision (c) of the statute. And on appeal from the denial of a section 1170.95 petition for failure to state a prima facie case for relief in such a situation, we have an obligation to do so as well." (*Secrease, supra*, 63 Cal.App.5th at p. 255, review granted.)

If "sufficient evidence in the trial record 'meets the minimum threshold of personal culpability set by *Banks* and *Clark*,' the felony-murder special-circumstance finding will 'foreclose resentencing as a matter of law.' " (*People v. Price* (2021) 71 Cal.App.5th 1128, 1149.) But, if "the record of conviction does not contain substantial evidence to support the finding under *Banks* and *Clark* … the petitioner [is] entitled to an order to show cause and an evidentiary hearing." (*Price*, at p. 1149; see *Secrease, supra*, 63 Cal.App.5th at p. 256, review granted ["If the factual findings underlying a jury's felony-murder special-circumstance determination are legally insufficient under *Banks* and *Clark*, we do not see how those findings can conclusively refute a prima facie showing of entitlement to resentencing relief."].)

The record of conviction presently before us consists solely of our prior appellate opinion in *People v. Epps, supra*, D059021, and some—but not all— of the jury instructions given at Epps's criminal trial. On this limited record of conviction, we simply cannot say that there was substantial evidence to support the jury's true robbery-murder special-circumstance findings under the standards enunciated in *Banks* and *Clark*. In particular, the limited

record of conviction available for our review does not disclose substantial evidence that Epps was a major participant in the underlying robbery.

In our prior appellate opinion, we opined that evidence elicited at Epps's trial showed she arrived at the National Inn at or about the same time as Rottiers and the victims, and was physically present at the scene of the robbery—factors that of course would tend to establish that she was a major participant in the robbery. (*Banks, supra*, 61 Cal.4th at p. 803 [in assessing whether a defendant was a major participant in an underlying felony, courts may weigh whether "the defendant [was] present at the scene of the killing"].) Additionally, our opinion noted there was evidence that Epps " 'might have handed [Rottiers] [a] phone cord,' " which Rottiers subsequently used to tie up one of the victims (*People v. Epps, supra*, D059021)—evidence that arguably would tend to show that Epps supplied an instrumentality (albeit not a lethal weapon) that was used to effectuate the robbery.

However, our prior appellate opinion is silent on many crucial issues that determine whether a defendant may be found to be a major participant in an underlying felony. It says nothing about "[w]hat role did the defendant have in planning" the robbery, if she had any at all. (*Banks, supra*, 61 Cal.4th at p. 803.) It does not disclose whether there was any evidence that Epps was aware "of particular dangers posed by the nature of the crime." (*Ibid.*) It does not state whether any evidence was introduced showing that Epps was aware of "past experience or conduct" of her codefendants. (*Ibid.*) Our prior appellate opinion does not disclose whether there was any evidence that Epps supplied a lethal weapon to either or both of her codefendants. Further, while evidence was introduced showing that Epps sat on the motel bed during the fatal robbery, our opinion does not state whether there was any evidence that Epps—who claimed she was high on drugs throughout the

32

fatal encounter—was actually in a realistic position to prevent the murders that were being perpetrated by Rottiers (and possibly by Hutchinson as well).

Our Supreme Court has cautioned that although appellate opinions are generally considered to be part of the appellate record, "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' " (*Lewis, supra*, 11 Cal.5th at p. 972.) That observation is particularly apt here, as many of the considerations governing the major participant analysis are referenced only briefly in, or omitted entirely from, our prior appellate opinion.

In short, the partial record of conviction before us does not disclose substantial evidence that Epps was a major participant in the underlying robbery under the governing standards set forth in *Banks*. Therefore, the limited record of conviction did not render Epps ineligible for resentencing as a matter of law, and an order to show cause must issue.[5] (*Harris, supra*, 60 Cal.App.5th at pp. 959–960 [petitioner's record of conviction did not preclude resentencing; factfinding was necessary to determine whether petitioner was a major participant in underlying felony]; see *Mejorado, supra*, 73 Cal.App.5th 574 [prior appellate opinion "reveal[ed] little about defendant's mental state during the course of the robbery," necessitating an order to show cause and evidentiary hearing].)

Other aspects of the record of conviction, as well as other admissible evidence, may shed more light on whether Epps was in fact a major participant in the underlying robbery. We will not prejudge that issue, which

---

[5] Given our conclusion that the record of conviction does not disclose substantial evidence that Epps was a major participant in the underlying robbery, it is unnecessary for us to assess whether the record of conviction reveals substantial evidence that Epps acted with reckless disregard for human life under the standards set forth in *Clark*.

can only be decided after the issuance of an order to show cause and an evidentiary hearing.

IV

DISPOSITION

The order summarily denying Epps's resentencing petition is reversed. The matter is remanded and the trial court is directed to issue an order to show cause pursuant to Penal Code section 1170.95, subdivision (c), and to conduct such further proceedings as are required by Penal Code section 1170.95, subdivision (d).

McCONNELL, P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.

34